UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK FRANKLIN HOELTZEL,

        Plaintiff,              Case Number 19-12328

v.                                     Honorable David M. Lawson
                                        Magistrate Judge Kimberly G. Altman

LYNETTA SMITH,

        Defendant.
_____/

## OPINION AND ORDER ADOPTING REPORT AND RECOMMENDATION, OVERRULING PLAINTIFF'S OBJECTIONS, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING THE COMPLAINT WITH PREJUDICE

Plaintiff Mark Franklin Hoeltzel, a federal prisoner, is a former medical doctor who was fired from his job at a University of Michigan Hospitals clinic, and ultimately prosecuted, for drugging and raping a patient. He filed this case alleging that his constitutional rights were violated during the investigation into his conduct by police officers, including university police officers, who seized certain property during the execution of a search warrant which, he says, was outside the scope of the warrant's authorization. The case was referred to Magistrate Judge Kimberly Altman to conduct pretrial proceedings. All the defendants named at the time filed motions for summary judgment. On February 4, 2021, Judge Altman filed a report recommending that the motions be granted. The Court adopted that report and dismissed the case against those defendants on March 30, 2021 and entered judgment dismissing the case. The dismissal order did not include defendant Lynetta Smith, who originally had been named as a "Jane Roe" defendant, but was later substituted into the case with the Court's permission. The Court later vacated the judgment (but not the order granting the summary judgment motions) because claims still remained to be adjudicated in the case against Smith, the sole remaining defendant.

Smith then filed her own summary judgment motion, and on September 28, 2021, Judge Altman filed a report recommending that her motion be granted. Hoeltzel filed objections, which are substantively identical to his objections to the earlier report. The case is before the Court for fresh review. The grounds supporting the recommendations for dismissal were substantially the same in both reports by the magistrate judge. Because the Court summarily adopted the earlier report and recommendation, the Court now will address the substance of the claims against all the defendants.

In their several motions, the defendants all have argued, among other things, that they are entitled to qualified immunity against the plaintiff's sole claim that they participated in an unlawful seizure of items from his home in violation of the Fourth Amendment. After considering all of the issues presented, it is apparent that facts viewed most favorably to the plaintiff demonstrate that qualified immunity bars the plaintiff from proceeding on his Fourth Amendment claim against any of the named defendants. After that, the other questions raised by the parties — the applicability of sovereign immunity to the official capacity claims against certain defendants, deficiencies in the factual allegations against other defendants, and the plaintiff's insistence that some marginal facts remain in dispute — all are immaterial. The Court will adopt the latest report and recommendation, overrule the plaintiff's objections, and enter a final judgment dismissing with prejudice the plaintiff's claims against all defendants.

I.

Most of the factual circumstances of the case are undisputed. The plaintiff contends that a few marginal facts remain hotly in dispute, and for this motion, the Court will accept his version.

Plaintiff Hoeltzel was a medical doctor employed at the University of Michigan Mott Hospital Pediatric Rheumatology Clinic. On December 5, 2017, the University of Michigan

suspended Hoeltzel from practice in the clinic after hospital administrators received reports that Hoeltzel had engaged in an inappropriate sexual relationship with a patient, and that the relationship also violated applicable ethical standards of care.

Defendant Margie Pillsbury is a Detective in the Special Victims Unit of the University of Michigan Police Department. On December 6, 2017, Pillsbury was assigned to conduct an investigation of possible criminal sexual misconduct by Hoeltzel. The investigation was commenced after Pam Bacon, an Investigator with the State of Michigan's department of Licensing and Regulatory Affairs ("LARA"), relayed concerns about the inappropriate sexual relationship to defendant Lynetta Smith, who then was employed as a Lieutenant in the University of Michigan Medicine Security Department. Smith subsequently reported the allegations of inappropriate conduct to Pillsbury.

On December 11, 2017, Pillsbury prepared an application for a search warrant and an affidavit in support of the application. On the same day, Magistrate Tamara Garwood of Michigan's 15th District Court issued a warrant for a search of the plaintiff's residence. In the warrant affidavit, Pillsbury included the following factual narrative that led her to suspect that the plaintiff had engaged in illegal sexual misconduct. *See* Warrant Affidavit dated Dec. 11, 2017, ECF No. 28-1, PageID.139-140.

LARA Investigator Pam Bacon received an anonymous tip suggesting that Hoeltzel was involved in an inappropriate sexual relationship with the patient referenced above. On December 6, 2017, Pillsbury discussed the tip with Bacon and defendant Smith. Bacon contacted the patient and interviewed her several times. During the interviews, the patient showed Bacon text messages and emails stored on her phone that corroborated the patient's claim that she and Hoeltzel had been involved in a sexual relationship for approximately three years. The patient said that the

relationship began after she was seen by Hoeltzel as a patient at UM Hospital. Hoeltzel and the patient had sex during subsequent clinic appointments, and Hoeltzel also visited her and had sex with her at her apartment. Hoeltzel also told the patient that she safely could consume alcohol and narcotic pain medications together, and after she did, he had sex with her. Bacon reviewed the patient's medical records and determined that the prescriptions for narcotics that Hoeltzel had issued were "beyond and outside of recommendations for a patient with [the patient]'s diagnosis."

Pillsbury investigated further and found in UM Police Department records a prior (2006) report of inappropriate contact by Hoeltzel with a minor patient, which was made by that patient's parents. However, the 2006 investigation had been closed after investigators determined that there was insufficient evidence of criminal sexual conduct.

Pillsbury then interviewed the current patient personally, who disclosed further details of her sexual encounters with Hoeltzel. Hoeltzel told the patient to schedule appointments on Fridays around lunch time, so he could "spend more time with her." The two had sex regularly during these appointments. Hoeltzel began visiting the patient at her apartment around January 2016. According to the patient's stated date of birth, she was 19 years old at that time. During the visits at her home, Hoeltzel "encouraged her to drink more than she wanted," and "told her explicitly that he wanted her to get 'black out drunk, so he could do what he wanted to her.'" Warrant Aff, ECF No. 28-1, PageID.139. During one encounter in February 2017, Hoeltzel goaded the patient to "chug" a large mixed drink of vodka and sprite, and after she did so she passed out, and he had sex with her. The patient said that she had no memory of the entire visit, and that Hoeltzel had carried her from the bed to the couch, where she awoke 12 hours later. During their encounters, Hoeltzel also discussed with the patient his visits with minor patients at the clinic, describing how he enjoyed viewing the "cleavage" and "butts" of "12-15 year old girls." *Id.* at PageID.140.

Hoeltzel also sent the patient photos of his penis and asked her to send nude images to him, which she did via text messages and email. Pillsbury viewed text messages and emails stored on the patient's phone that corroborated her account of the relationship. Finally, Pillsbury discussed the patient's medical history with Hoeltzel's supervisor, who advised her that the patient was considered a "vulnerable person" due to her multiple diagnoses of emotional and anxiety disorders, and that the frequency of her appointments with Hoeltzel was unusual for a patient with her medical situation.

Notably, Hoeltzel alleged in his amended complaint that his claims in this case do not "challenge[] . . . the validity of the underlying search warrant." Am. Compl. ¶ 13, ECF No. 35, PageID.196. Throughout this litigation, Hoeltzel has not advanced any claim that the search was illegal based on any deficiency of probable cause in the warrant or affidavit that authorized a search of his home for evidence of criminal sexual misconduct. Instead, his sole claim is that the execution of the search was unlawful because some of the items seized were not particularly described in the warrant specification. Hoeltzel also affirmatively alleges that "[t]he Items were never used to investigate, prosecute, or convict plaintiff Hoeltzel in any criminal matter, either in state or federal court." Am. Compl. ¶ 12.

The warrant authorized a search of the plaintiff's home and attached garage, and the specification authorized the seizure of "any digital storage media*, computer cellular phone, or digital transmission device**." The term "digital storage media" was defined as "includ[ing], but [] not limited to, any device which is capable of creating, modifying or storing electronic or magnetic forms of data, or is capable of being read or interpreted by a computer," and the term "digital transmission device" was defined as "includ[ing], but [] not limited to, any digital device which is capable of communicating with other electronic and digital devices through wired or

wireless means." The warrant further authorized the seizure of all the following categories of items: (1) "[a]ny computer hardware or computer-related equipment or computer peripheral," (2) "[a]ny and all images of a penis or nude images of [the patient]," (3) "[p]roof of residency, [p]roof of ownership of computers, credit card bills showing payments to Internet Service Providers and website or download venues," and (4) "[w]allets, purses, or other personal luggage or personal digital assistants that may contain passwords, pass phrases or other encryption information." Search Warrant, ECF No. 28-1, PageID.141.

The warrant was executed on December 12, 2017, by a team of officers from the University of Michigan Police Department which included Pillsbury; her co-defendants and fellow UMPD Officers Maureen Burke, Kevin Lucas, Tom Cargill, Mark Worosz, and Theo Chalogianis; and Pillsbury's supervisor, defendant Janet Martin-Connors (a.k.a. Sergeant Conners). Defendant Detective Kevin Parviz from the Washtenaw County Sheriff's Department also was present during the search. However, Parviz says that his participation was confined to "forensic analysis" of items after they were seized, and he asserts that he did not participate in the location or collection of any items. Defendant Pillsbury acted as the officer in charge during the search.

During the execution of the warrant, the officers on scene discovered the plaintiff's "UM identification card (called an MCard), a key fob, a duo token and Michigan Medicine patient files." Pillsbury decl. ¶ 4, ECF No. 28-2, PageID.145. Pillsbury explained that a "'Duo token' is a standalone hardware device that generates a passcode needed for U-M systems and resources." *Ibid.* When those items were found, Pillsbury called defendant Smith, who requested that Pillsbury seize the items on the basis that "they were property of U-M and controlled Plaintiff's access to U-M buildings and facilities." *Id.* ¶ 5. The plaintiff contends that there is a factual dispute about the exact nature and number of the items seized. In his objections, Hoeltzel insists that five items

were seized, not four, and that the item listed on the warrant return as a "key fob" was in fact a "lanyard," which he says is a cord or ribbon that was attached to the MCard, the Duo token, and a "key." Accepting the plaintiff' version, the following five items were seized: (1) a UM identification card a.k.a. "MCard," (2) a "lanyard" a.k.a. "key fob," (3) a "key," (4) a "Duo token," and (5) "Michigan Medicine patient files." Hoeltzel also asserts, and the Court assumes for the sake of analysis, that a "lanyard" or "key fob," a "key," and "patient files" are not electronic or digital devices. However, the Court also notes that Hoeltzel affirmatively alleged in this complaint that all of the items in question were "employment-related." Am. Compl. ¶ 5, ECF No. 35, PageID.196. Hoeltzel also admits and asserted in his objections "that a lanyard is used to hold keys and ID's [sic], and in this case was holding the key, Duo token, and MCard." Plf. Objs., ECF No. 64, PageID.437. Finally, Hoeltzel characterizes the "Michigan Medicine patient files" as "folders containing research files with de-identified patient information." Am. Compl. ¶ 4. He asserts that outwardly the folders were unremarkable and unmarked, and that it would not be apparent to a casual observer, before opening the files and examining their contents, that they were "patient files" or contained information about U-M patients. The Court accepts that characterization as accurate for the purpose of this decision.

Hoeltzel's complaint pleads a single claim via 42 U.S.C. § 1983 alleging violation of the plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. The magistrate judge issued a scheduling order, and discovery initially was permitted through October 2020. However, the magistrate judge later granted a motion by the defendants to stay discovery pending the resolution of their several dispositive motions asserting immunity defenses.

In the reports and recommendations, the magistrate judge concluded that the claims must be dismissed because all of the defendants were entitled to qualified immunity, since their conduct

in seizing the items did not demonstrate "flagrant disregard" for the limitations of the warrant specification; the official capacity claims for recovery of money damages against some of the defendants were barred by the State of Michigan's sovereign immunity under the Eleventh Amendment; the seizure of the "patient files" was justified under the "plain view" exception to the warrant requirement; the plaintiff's Fourth Amendment rights were not violated because he held no "possessory interest" in any employment-related items that were seized after his employment was suspended; and the factual allegations against defendant Parviz failed sufficiently to establish his personal participation in any constitutional violation.

The plaintiff filed objections to both reports which raised substantially identical challenges to the grounds for the magistrate judge's recommendations for dismissal, both of which were premised on the same factual and legal conclusions.

II.

"The filing of objections provides the district court with the opportunity to consider the specific contentions of the parties and to correct any errors immediately," *Walters*, 638 F.2d at 950, enabling the court "to focus attention on those issues-factual and legal-that are at the heart of the parties' dispute," *Thomas v. Arn*, 474 U.S. 140, 147 (1985). As a result, "'[o]nly those specific objections to the magistrate's report made to the district court will be preserved for appellate review; making some objections but failing to raise others will not preserve all the objections a party may have.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006) (quoting *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)).

The plaintiff objected to the recommendations for dismissal on the following grounds, which were asserted in similar form, although enumerated differently, in his filed objections: (1) the "lanyard" or "key fob," the "key," and the "patient files" that were seized were not "digital

- 8 -

devices," and therefore were not covered by any category of items authorized for seizure by the warrant, (2) the "plain view" exception to the warrant requirement does not excuse the seizure of the "patient files" because their nature and contents were not immediately apparent to the officers upon their discovery, and the fact that they contained patient information only could be discovered by "further investigation" into their contents, (3) there is no "ownership" or "possessory interest" exception to the Fourth Amendment, which was relied upon by the magistrate judge to excuse the seizure of "employment related" items, (4) the University of Michigan police officers "were not legally present in their dual role as security guards," (5) defendant Parviz can be held liable for Fourth Amendment violations regardless of his assigned duties, because he was "present" during the search, (6) the recommendation for dismissal of the official capacity claims erroneously assumed that the plaintiff had not identified any "policy" promulgated by the University endorsing unlawful warrantless searches, (7) the recommendation for summary dismissal was procedurally flawed because the plaintiff was not allowed to obtain discovery to substantiate his version of certain disputed facts, and (8) the magistrate judge's analysis overlooked the plaintiff's demand for injunctive relief.

The Court agrees with the magistrate judge's conclusion that qualified immunity bars all of the claims against all defendants. That finding is dispositive of the plaintiff's claim, so the Court will not address the other substantive issues raised by the magistrate judge and the plaintiff's objections.

One procedural objection, though deserves discussion. The plaintiff insists that the case is not in an appropriate posture for a dispositive ruling because he has not been allowed to obtain discovery from the defendants, including photographs of the items seized, which he says would validate his assertions about the number and nature of the items. However, discovery is

unnecessary to the resolution of the qualified immunity defense, because the Court assumes that the facts asserted by the plaintiff either are proven or could be proven if further discovery were permitted.

The plaintiff's amended complaint pleads a single claim under 42 U.S.C. § 1983 for alleged violations of his Fourth Amendment rights. To state a claim under that statute, a plaintiff must allege that (1) he was deprived of a right, privilege, or immunity secured by the federal Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law. *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978); *Harris v. Circleville*, 583 F.3d 356, 364 (6th Cir. 2009); *Brock v. McWherter*, 94 F.3d 242, 244 (6th Cir. 1996).

The plaintiff relies on the Fourth Amendment for the substance of his claim. It is well settled that the Fourth Amendment prohibits "unreasonable searches and seizures," and that in most instances, a search is unreasonable "if it is not conducted pursuant to a warrant issued upon probable cause." *Liberty Coins, LLC v. Goodman*, 880 F.3d 274, 280 (6th Cir. 2018) (quoting U.S. Const. amend. IV; citing *Camara v. Municipal Court of City & County of San Francisco*, 387 U.S. 523, 528-29 (1967)). It is undisputed that a warrant was obtained that authorized the search of the plaintiff's residence for evidence relating to his suspected criminal sexual misconduct with patients. Moreover, the plaintiff expressly disclaims any challenge to the adequacy of the probable cause showing in the affidavit that supported the warrant application.

However, the Fourth Amendment contains a further requirement: "that a search warrant 'particularly describ[e]' the places law enforcement may search and the things they may seize." *United States v. Castro*, 881 F.3d 961, 964 (6th Cir. 2018). (quoting U.S. Const. amend. IV). Thus, "[w]arrants [both] empower and constrain" investigators to conduct the authorized search. *Ibid.* (citing *Riley v. California*, 573 U.S. 373, 386 (2014)). The plaintiff's sole constitutional claim is

that the seizure of certain items that were not enumerated in the warrant specification violated the Fourth Amendment's particularity principle.

"General warrants that fail to describe with particularity the things to be searched for and seized 'create a danger of unlimited discretion in the executing officer's determination of what is subject to seizure and a danger that items will be seized when the warrant refers to other items.'" *United States v. Henson*, 848 F.2d 1374, 1382-83 (6th Cir. 1988) (quoting *United States v. Savoca*, 761 F.2d 292, 298-99 (6th Cir. 1985)). "However, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought," so "'a description is valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" *Ibid.* (quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir. 1985)). And "a search does not become invalid merely because some items not covered by a warrant are seized." *Sampson v. Gee-Cram*, 655 F. App'x 383, 389 (6th Cir. 2016). "[A]n otherwise valid search becomes an impermissible general search only where the searching officers demonstrate a flagrant disregard for the limitations of a search warrant." *Ibid.*

All defendants have argued that they are entitled to qualified immunity against the plaintiff's Fourth Amendment claim. Once that defense is raised, the plaintiff is obliged to demonstrate both that the challenged conduct violated a constitutional right and that the right was clearly established at the time. *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). "If the plaintiff fails to establish either element, the defendant is immune from suit." *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014). However, when the qualified immunity defense is raised in a motion for summary judgment, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007). That means that the Court must view the facts in the

light most favorable to the plaintiff, *Saucier v. Katz*, 533 U.S. 194, 201 (2001); "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *Scott*, 550 U.S. at 378. The Court may take up the two questions presented by the qualified immunity analysis in either order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and in this case the defense can be addressed by focusing on the second element.

The second inquiry in the qualified immunity analysis examines whether the right allegedly violated was "clearly established." "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Even when there is no case defining a constitutional right that directly mirrors the fact pattern confronted by the defendant, "'an official can be on notice that his conduct violates established law even in novel factual situations.'" *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) (quoting *Littlejohn v. Myers*, 684 F. App'x 563, 569 (6th Cir. 2017); *Hope v. Pelzer*, 536 U.S. 730, 731 (2002)). The touchstone of the "clearly established" inquiry is "fair warning." *Baynes*, 799 F.3d at 612-13 (quoting *Hope*, 536 U.S. at 741). "Qualified immunity ordinarily applies unless it is obvious that no reasonably competent official would have concluded that the actions taken were unlawful." *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009). Moreover, "because 'immunity protects all but the plainly incompetent or those who knowingly violate the law,' [the Court] must not 'define clearly established law at a high level of generality.'" *Tlapanco v. Elges*, 969 F.3d 638, 649 (6th Cir. 2020) (quoting *Kisela v. Hughes*, --- U.S. ---, 138 S. Ct. 1148, 1152 (2018)).

The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended

to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted). The conduct of the defendants demonstrated by the undisputed and assumed facts in the record before the Court falls comfortably within the margin of error afforded by their qualified immunity. Accordingly, the factual record that has been presented, along with the facts assumed by the Court, all viewed in the light most favorable to the plaintiff, cannot sustain the Fourth Amendment claim against the defense that no reasonable officer in the defendants' positions would have been under fair warning that their conduct violated clearly established law.

The clearly settled law in this circuit holds that "a search does not become invalid merely because some items not covered by a warrant are seized." *Sampson*, 655 F. App'x at 389. Seizure of non-specified items becomes unconstitutional only where the searchers exhibit "a flagrant disregard" for the search warrant's limitations. *Ibid.* The record in this case does not show that.

An officer "can seize [an] item not listed in a warrant" when "it is reasonably related to the offense which formed the basis for the search warrant." *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011). Even if the seizure of a particular unlisted item is not supported by probable cause, qualified immunity may protect the officer. *Id.* at 839 (holding that courts need not determine the probable cause question "for purposes of granting qualified immunity".). Settled law establishes that a questionable seizure of items that later are found to be entirely legal and

- 13 -

unrelated to any criminal conduct is shielded by qualified immunity as long as the on-scene evaluation of the items by the seizing officer was not "objectively unreasonable." *Libretti v. Woodson*, 600 F. App'x 367, 371 (6th Cir. 2015) (upholding seizure of "legal herbs" during search for evidence relating to the crime of possession with intent to distribute controlled substances, along with certain documents that turned out to be unrelated to the charged crimes). The defendants' determination that all of the disputed items were reasonably related to the suspected crime was not objectively unreasonable here.

The defendants' conduct during the search demonstrated caution and restraint, and any questionable decision to seize particular items fell far short of "flagrant disregard" for the boundaries of the warrant authorization. It is undisputed that the "Duo token" and "M-Card" have some digital or electronic components and transmission or digital interaction capabilities. Those items, therefore, were within the categories of items that the warrant explicitly authorized for seizure. The plaintiff insists that a "lanyard" or "key fob" and an ordinary metal "key" have no digital components and could not reasonably be viewed as fitting within any category of items described in the warrant. However, those items indisputably were "reasonably related" to the suspected offense of criminal sexual misconduct. The plaintiff admits that all five of the items in question were "employment related," and there is no serious dispute that the "key," "Duo token," and "MCard" were issued to the plaintiff to facilitate his access to U-M systems or facilities. The warrant affidavit stated that the plaintiff was suspected of engaging in criminal sexual misconduct with one or more patients who were seen by him as a doctor at a U-M hospital clinic. Prudent officers in the defendants' positions on the scene reasonably could have determined that those access tokens would be likely to establish the plaintiff's presence at times and places where the suspected crime occurred. The defendants also reasonably could have determined that "Michigan

Medicine patient files" could contain information identifying patients with whom the plaintiff engaged in sexual misconduct, and might disclose details of his interactions with them.

The plaintiff objects that the "lanyard" has no apparent utility in the commission of any type of sexual misconduct. However, he affirmatively admits that the "lanyard" was attached to or entangled with the "key," "Duo token," and "MCard." Reasonable officers on the scene would not have been on notice that they were obligated under clearly established law to disentangle such bundled items, segregating those that could be seized from that that should not be, rather than seizing the entire package of attached items, some of which reasonably related to the crime under suspicion. *United States v. Henson*, 848 F.2d 1374, 1383-84 (6th Cir. 1988) ("A search does not become invalid merely because some items not covered by a warrant are seized. This is especially true where the extra-warrant items were not received into evidence against the defendant. . . . In this case, we do not find a flagrant disregard for the terms of the search warrant. Since the extensive seizure of records was authorized by the terms of the warrant, it was inevitable that the officers would seize documents that were not relevant to the proceedings at hand. We do not think it is reasonable to have required the officers to sift through the large mass of documents and computer files found in the Hensons' office, in an effort to segregate those few papers that were outside the warrant."). Moreover, the conclusion that the seizure of comingled crime-related and unrelated items is not unreasonable further is bolstered where, as here, it is undisputed that the unrelated items in dispute never were used as evidence against the plaintiff in a criminal prosecution. *Ibid*. Finally, rather than engaging in a wholesale sweep for masses of unrelated items without regard to their evidentiary value, it is undisputed here that defendant Pillsbury took the time to consult with defendant Smith, who initially reported the potentially criminal conduct, before deciding that the employment related ID tokens and patient files were items that could relate to the criminal

investigation. The fact that the defendants solicited further information from a civilian informant to confirm the evidentiary potential of questionable items evidences restraint in the execution of the search, far from flagrant disregard. *See Sampson*, 655 F. App'x at 389 (upholding the seizure of bank accounts held by an entity that was not identified in financial warrants as an entity whose accounts were to be seized, where bank employees were consulted by investigators during execution of the warrant and determined that accounts fell within the scope of the warrant because the defendant was a signer on the accounts).

The plaintiff objects that the "patient files" could not be seized because a casual observer could not have known from perusal of the unmarked exteriors of the folders that they contained patient information, and therefore it could not have been determined, without opening the folders and viewing the contents, that they were reasonably related to the suspected crime. However, that argument overlooks the fact that the warrant explicitly authorized the seizure of "[a]ny and all images of a penis or nude images of [the patient]," as well as "[p]roof of residency, [p]roof of ownership of computers, credit card bills showing payments to Internet Service Providers and website or download venues." Search Warrant, ECF No. 28-1, PageID.141. The warrant did not confine the authorization to seizure of such information stored exclusively in digital form, so the authorization extended to both digital devices and any documents which might contain the listed types of information or images. It is well settled that "a warrant relates to the premises as the police find them," and, where "[t]he magistrate judge issue[s] a warrant that allow[s] police to search the entire residence for [particular items relating to a crime] . . . such a warrant allows the police to search any container found within the residence that could reasonably contain such [items]." *United States v. Herrera*, 636 F. App'x 250, 253 (6th Cir. 2016). Ordinary, even unmarked, file folders containing information from "patient files" certainly could be expected to

contain photographs and documents relating to the plaintiff's ownership of computers, along with indications of his use of internet services, or specific types of records such as "credit card bills," all of which the defendants were authorized to seize. The defendants did not transgress any clearly established law by opening the folders to search therein for the types of images, documents, and records that the warrant authorized them to seize. *Herrera*, 636 F. App'x at 253 ("Here, the police had a warrant to search the house for drug-related documents. That warrant permitted police to search anywhere that the drug-related documents might be. The bags could have easily contained such documents, and thus the warrant permitted the police to search them. Indeed, one of the bags was a backpack, the type of container in which people often store documents. And once the police opened the bag, the plain view doctrine allowed the police to seize the cocaine that they found inside. Thus, it seems that the warrant authorized the police to search the bags.") (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)).

The plaintiff also objects that the University of Michigan Police Officers, including defendant Pillsbury and her fellow officers in the department, were not legally authorized to execute a search warrant in the State of Michigan. However, state law expressly authorizes any "peace officer" employed by a public agency to execute a judicially issued search warrant. According to the pertinent statute: "*A search warrant shall be directed to the sheriff or any peace officer*, commanding the sheriff or peace officer to search the house, building, or other location or place, where the person, property, or thing for which the sheriff or peace officer is required to search is believed to be concealed." Mich. Comp. Laws § 780.654(1) (emphasis added). The applicable law also explicitly authorizes "[t]he governing board of control of a public 4-year institution of higher education created under article VIII of the state constitution of 1963 [to] grant the public safety officers of the institution *the same powers and authority as are granted by law to*

*peace and police officers to enable the public safety officers to enforce state law* and the ordinances and regulations of the institution of higher education," and the law further provides that "*[p]ublic safety officers to whom the powers and authority of peace and police officers are granted under this section shall be considered peace officers of this state.*" Mich. Comp. Laws § 390.1511(1) (emphasis added). The plaintiff has cited no legal authority supporting the proposition that the defendants involved in the warrant execution were not legally empowered to do so under the applicable state statutes.

Finally, the plaintiff also objects to portions of the magistrate judge's analyses which considered the "plain view" and "possessory interest" exceptions to the warrant requirement. However, the Court finds that the conclusion that qualified immunity shields all of the defendants' conduct may be reached without regard to either of those principles. The plaintiff's objections to the reasoning concerning those rules of law therefore are immaterial to the outcome. The plaintiff also objects that the magistrate judge overlooked his prayer for injunctive relief when analyzing the availability of sovereign immunity for some defendants. However, because the plaintiff cannot obtain relief on any of his claims, against any defendants, the applicability of other immunity principles besides qualified immunity is irrelevant to the disposition of the case. The plaintiff's objections concerning the sufficiency of the allegations against defendant Parviz also are immaterial because, for all of the reasons discussed above, qualified immunity uniformly shields all of the defendants in this case from suit. As noted above, the plaintiff's objection that he was not allowed to conduct "limited discovery" to bolster his factual presentation is immaterial because the Court has accepted all of the facts that he postulated as proven, or provable.

III.

The conduct of the defendants that is challenged by the complaint did not violate any clearly established law, and all of the defendants therefore are entitled to qualified immunity. The plaintiff's objections to the recommendations for dismissal all are either meritless or immaterial to the disposition of the case.

Accordingly, it is **ORDERED** that the report and recommendation (ECF No. 73) is **ADOPTED**, and the plaintiff's objections (ECF No. 64, 76) are **OVERRULED**.

It is further **ORDERED** that defendant Lynetta Smith's motion for summary judgment (ECF No. 59) is **GRANTED**.

It is further **ORDERED** that the amended complaint in its entirety and all of the plaintiff's claims against all defendants are **DISMISSED WITH PREJUDICE**.

                                                    s/David M. Lawson
                                                    DAVID M. LAWSON
                                                    United States District Judge

Dated:  March 17, 2022